IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**PAUL M. DANFORD**,

                Plaintiff                         Civil No. 09-6171-ST

                v.                         **OPINION AND ORDER**

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

                Defendant.

STEWART, Magistrate Judge:

Plaintiff, Paul Danford ("Danford"), seeks judicial review of the Social Security

Commissioner's final decision denying his application for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act ("Act"). This court has jurisdiction under 42 USC

1 - OPINION AND ORDER

§§ 405(g) and 1383(c). All parties have consented to entry of final judgment by a Magistrate Judge in accordance with FRCP 73 and 28 USC § 636(c).

For the following reasons, the Commissioner's decision is reversed and remanded for the immediate calculation and award of benefits.

## PROCEDURAL BACKGROUND

Born in 1953, Danford has a high school education.  Tr. 109, 119.[1]  He applied for SSI in 1993 and 1999, alleging disability due to paranoid schizophrenia and asthma.  Tr. 38-40.  The Commissioner denied these applications, and an Administrative Law Judge ("ALJ") issued a decision on December 27, 2000, finding Danford not disabled.  Tr. 38-46.  The record does not show that Danford appealed that decision.

Danford again applied for SSI based upon these impairments on October 2, 2003, alleging disability since November 30, 1992.  Tr. 109-10.  The Commissioner denied this application initially and upon reconsideration.  Tr. 58-65.  ALJ Marilyn S. Mauer then held hearings on February 1 and October 3, 2006.  Tr. 505-61.  At the second hearing Danford amended his alleged onset date to December 28, 2000.  Tr. 15, 560.  On February 8, 2007, the ALJ issued her decision finding Danford not disabled.  Tr. 15-24.  On April 15, 2009, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner regarding her first application. Tr. 5-7.  Danford appeals that decision.

///

///

## BACKGROUND

---

[1] Citations "Tr." refer to indicated pages in the official transcript of the administrative record filed with the Commissioner's Answer on December 1, 2009 (Docket #11).

I.    **Medical Record**

A.    **Before the Alleged Onset Date**

Danford's parents referred him to Deschutes County Mental Health ("DCMH") in September 1988. Tr. 413. The intake summary listed a diagnosis of paranoia with psychotic-like qualities, but the record does not show that Danford pursued treatment. Tr. 414.

An intake examination with DCMH over a decade later on February 11, 1999, diagnosed Danford with paranoid schizophrenia. Tr. 396-99. On February 17, 1999, case manager and social worker Ginny Hume, BA, noted that Danford was paranoid and believed he was being held hostage by his parents. Tr. 400. On March 16, 1999, Hume noted that Danford required re-directing in conversation. Tr. 391. Hume continued to meet with Danford in April and June 1999 and encouraged him to explore assisted living and vocational training at local facility called Fowler House. Tr. 389-90.

Michael McNamara, a Psychiatric Mental Health Nurse Practitioner ("PMHNP"), treated Danford at DCMH between March and December 1999. Tr. 372-88, 395. During this time, McNamara diagnosed Danford with paranoid schizophrenia and prescribed psychotropic drugs. *Id.* On September 9, 1999, McNamara stated that Danford was "unable to work secondary to his chronic mental illness because of paranoia, cognitive impairment (including poor concentration), poor social skills and residual negative symptoms of schizophrenia." Tr. 195. On October 22, 1999, he noted that Danford was improved, but had residual psychosis. Tr. 375. On December 29, 1999, McNamara found that Danford had a "very good presentation for [him]" and was experiencing residual signs and symptoms of his illness despite medication. Tr. 372.

**B.**     <u>**2000-2003**</u>

Between 2000 and 2003, DCMH nurse practitioners continued to diagnose schizophrenia and prescribe medication.  Tr. 204-44, 302-71.

On August 7, 2002, McNamara again diagnosed Danford with  paranoid schizophrenia and added intermittent depression.  Tr. 234.  Also in August 2002, Hume again encouraged Danford to explore sheltered housing and vocational rehabilitation, and Danford responded that he "might think about working sometime in the future."  Tr. 235.

In September 2003, Danford reported to Hume that he was "doing well."  Tr. 209.  Hume concurrently wrote a letter supporting Danford's application for food stamps, stating that he could not work.  Tr. 210.

On November 4, 2003, Sharon Schmidt, PMHNP, also diagnosed paranoid schizophrenia and noted that Danford was "profoundly influenced" by auditory hallucinations.  Tr. 204.

Examining psychologist Michael R. Villanueva, PhD, evaluated Danford for Disability Determination Services ("DDS")[2] on December 5, 2003.  Tr. 171-75.  Dr. Villanueva performed a clinical interview and evaluation and also interviewed Danford's mother.  *Id.*  He noted that Danford "in his interview considerably underplayed his history of psychological difficulties."  Tr. 172. Dr. Villanueva diagnosed Danford with schizophrenia (paranoid type) with a history of alcohol abuse and remote history of substance abuse.  Tr. 174.  He noted that Danford has a history of difficulties with law enforcement and family relations, stated that his mental status examination was

---

[2] DDS is a federally-funded state agency that makes eligibility determinations on behalf and under the supervision of the Social Security Administration pursuant to 42 USC § 421(a) and 20 CFR § 416.903.

grossly intact, and inferred that his activities of daily living are not demanding.   Tr. 175.

Dr. Villanueva concluded that, by history, Danford "has never really been able" to work.  *Id*.[3]

**C.   2004-2005**

Danford continued to receive regular treatment at DCMH for his paranoid schizophrenia

throughout 2004 and 2005.  Tr. 267-301.

Throughout 2004, Hume noted "no change" in Danford's presentation.  Tr. 201, 285, 287,

290, 292, 299.  She repeatedly urged Danford to plan for his future, noting that he lived with his

elderly parents.  Tr. 199.

Another nurse practitioner, Nancy Bidlack, PMHNP, who saw Danford three times in 2005,

also diagnosed paranoid schizophrenia, found him stable, continued the same medications, and wrote

a note that he could not maintain employment due to his illness for the purpose of receiving food

stamps.  Tr. 277-29.

**D   2006**

Janet Eggers, PMHNP, at DCMH also diagnosed Danford with paranoid schizophrenia and

on March 8, 2006, noted his reports of continued auditory hallucinations.  Tr. 469.

Examining psychologist Barbara Ann Perry, PhD, evaluated Danford on March 21, 2006,

and submitted a report dated April 5, 2006.  Tr. 449-60.  She reviewed Danford's DCMH medical

records, performed numerous tests and clinical examinations, and interviewed Danford's mother.

Tr. 449.  Dr. Perry diagnosed Danford with "schizophrenia, paranoid type, per history of Douglas

County Mental Health Records," and "dysthymia vs. major depressive disorder."  Tr. 460.

Regarding Danford's ability to work, Perry suggested that Danford be placed in a work shelter or

---

[3]  The record contains an irregular photocopy on this page obscuring some words.

vocational rehabilitation environment where staff could monitor the effects of his behavior and determine whether his mental illness prevents him from working.  Tr. 459.  Dr. Perry finally noted that, although Danford reported reading various books, she had "doubts about his ability to comprehend and remember details."  *Id.*

Dr. Perry also completed a concurrent mental residual functional capacity form.  Tr. 461-62. She found Danford "markedly" limited in understanding and carrying out detailed instructions, maintaining attention for extended periods, working in proximity to others without distraction, interacting with the general public, traveling in unfamiliar places, and setting realistic goals independently of others.  Tr. 461-62.  She found Danford "moderately" limited in performing and attending duties within a schedule, sustaining an ordinary routine without supervision, maintaining appropriate social behavior, and being aware of normal hazards with appropriate precautions.  *Id.*

DCMH treating psychiatrist Jean C. Purvis, MD, examined Danford on May 31, 2006. Tr. 475-77.  Dr. Purvis noted Danford's reports of auditory hallucinations and irrational fears regarding persecution and jail.  Tr. 475.  She observed that Danford was stiff, restless, made jerky movements, rocked in his chair, and had a blunt affect.  Tr. 476.  Consistent with the prior diagnoses, Dr. Purvis diagnosed Danford with "schizophrenia, paranoid type, with prominent negative symptoms."  *Id.*  Dr. Purvis recommended that Danford pursue vocational rehabilitation but stated that the stress of work activity might cause his symptoms to worsen.  *Id.*

///

///

///

///

6 - OPINION AND ORDER

## II.    Danford's Testimony

### A.    Disability Reports

In his first disability report, filed on October 1, 2003, Danford stated that his workplace ability is limited by his paranoia, cognitive impairment and poor concentration, limited social skills, and asthma.  Tr. 113.

In his November 2, 2003, Activities of Daily Living Report, Danford reported that he lives with his mother, father, and brother, fixes his own breakfast and lunch, helps with the dishes, sweeps, vacuums, and does his own laundry.  Tr. 126.  He shops for his own food with his food stamps, and his family shops for his clothing.  Tr. 127.  Danford reported troubling remembering what he reads.  Tr. 128.  He goes to church on Sundays, but does not belong to any other social groups.  Tr. 129.

Danford completed a second disability report on March 9, 2004, in conjunction with his appeal.  Tr. 141-47.  He stated that he is easily fatigued and that his paranoia has worsened and is "overwhelming."  Tr. 141.  He worries "to the point [he is] unable to follow through."  *Id.*

### B.    Hearing Testimony

At his October 3, 2006 hearing before the ALJ, Danford testified that he sought treatment at DCMH because he was hearing voices.  Tr. 524.  He intermittently hears voices which "drive him up the wall" or "bother" him.  Tr. 525.  He was taking medications for these symptoms, but they cause anxiety and fatigue as side effects.  Tr. 526, 540.  Because of these side effects, he must rest for about two hours per day.  Tr. 527.

Danford also testified that he tries to walk at least once per day for a 30 minutes to an hour. Tr. 526. In previous years, he "used to walk two or three hours, but that left me totally exhausted so I couldn't function. So I cut down, you know, the amount of walking I did." *Id.*

Regarding his ability to get along with others, Danford testified that he bickered with his brother, but could get along with neighbors after beginning his medication regime. Tr. 529. He continues to be unsure of himself, even with medication, and for this reason reported to DCMH providers that he was not interested in vocational rehabilitation. Tr. 532-33.

He can concentrate for "about an hour" but suffers symptoms, such as hearing voices. Tr. 533. These voices tell him that someone is going to kill him, break his neck or back, or that dogs are going to bite him. Tr. 534. The voices make him anxious and fearful, and he may rock back and forth when seated, though he does not know why. Tr. 536. The voices may keep him from what he is doing three or four times a day for periods ranging between one and 45 minutes, but he has been learning to push these thoughts out of his mind. Tr. 534-35. He cannot do anything by himself, other than attend church and take walks. Tr. 543-44.

## III.    Lay Testimony

### A.    Third Party Report

In a third party report dated November 2, 2003, Danford's mother, Alyce Danford, wrote that Danford prepares himself frozen dinners and helps with household chores, such as mopping the floor or drying dishes. Tr. 134. He does not do these activities every day and requires reminding to perform these tasks. *Id.* Danford shops for groceries with his food stamps and reads. Tr. 135-36. He also goes for walks five times a week, although he cannot walk as far as he used to, and "sometimes can walk 2 miles" with a half hour rest before walking further. Tr. 136-37. Danford

interacts with librarians and fellow church members and relates "ok" to authority figures, such as the police, as long as he takes his medication. *Id*. Ms. Danford also described Danford's rocking behavior when seated and stated that he gets upset easily and paces when stressed. Tr. 138.

**B.    Hearing Testimony**

At the October 3, 2006 hearing, Ms. Danford testified that Danford lives with her, sometimes helps with the dishes, and will do other household chores when asked. Tr. 546-47. However, he "forgets what he's doing or sometimes just doesn't finish it." Tr. 548. She must tell Danford things "over and over again." *Id*. He has increasing difficulty completing tasks that require a longer sequence of steps and is unable to finish tasks that require more than "about a half hour." Tr. 548-49.

**DISABILITY ANALYSIS**

The Commissioner engages in a sequential process encompassing between one and five steps in determining disability under the meaning of the Act. 20 CFR § 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If he is, the claimant is not disabled. 20 CFR § 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve month duration requirement. 20 CFR §§ 416.909, 416.920(a)(4)(ii). If the claimant does not have such a severe impairment, he is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 416.920(a)(4)(iii). If the impairment is determined to equal a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by his impairments. 20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, *available at* 1996 WL 374184.

The ALJ uses the RFC to determine if the claimant can perform his past relevant work at step four. 20 CFR § 416.920(a)(4)(iv). If the claimant can perform his past relevant work, then he is not disabled. If the ALJ finds that the claimant's RFC precludes performance of his past relevant work or that the claimant has no past relevant work, the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing work existing in the national economy. *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 416.920(a)(4)(v), 416.920(f). If the claimant cannot perform such work, then he is disabled. *Id.*

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id* at 1100. If the Commissioner meets this burden, the claimant is not disabled. 20 CFR §§ 405.1520(g), 416.920(g).

///

## THE ALJ'S FINDINGS

The ALJ first found that Danford did not engage in substantial gainful activity after his alleged onset date. Tr. 17. At step two, the ALJ found that Danford had the severe impairments of "paranoid schizophrenia controlled with medication" and "asthma controlled with medication." *Id.* At step three, the ALJ found that these impairments did not meet any disorders listed in the Commissioner's regulations and that Danford may perform light work with the following limitations:

> He is able to lift 20 pounds occasionally, 10 pounds frequently, stand or walk for about six hours, and sit for about six hours during an eight hour workday. He can do a job that does not involve concentrated exposure to dust, fumes, or odors. With respect to his mental abilities, he can perform simple, repetitive tasks of one to three steps, in a position that involves no public contact and no close interaction with coworkers.

Tr. 21.

At step four, the ALJ found that Danford had no past relevant work (Tr. 21), but at step five found that he could perform work in the national economy as a small products assembler, housekeeping cleaner, or maker. Tr. 22-24. The ALJ therefore found Danford not disabled.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r for Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Bray v. Comm'r of the Soc. Sec. Admin*, 554 F3d 1219, 1222 (9th Cir 2009), quoting *Andrews v. Shalala*, 53 F3d 1035,

1039 (9th Cir 1995). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Id*; *see also Batson*, 359 F3d at 1193.

## DISCUSSION

Danford challenges the ALJ's credibility finding, evaluation of the medical evidence, and evaluation of the lay testimony. Accordingly, Danford asserts that the ALJ should have found him disabled at step five.

## I.   Danford's Credibility

The ALJ found "not entirely credible" Danford's statements regarding the intensity, persistence, and pace of his symptoms. Tr. 21. The ALJ did not list specific reasons for this finding. However, her subsequent discussion found that Danford did not work due to "lack of motivation, rather than his impairments" and that nurse practitioner McNamara reported that Danford had "good" activities of daily living. Tr. 18-19.

### A.   Legal Standards

The ALJ must consider all symptoms and pain which "can be reasonably accepted as consistent with the objective medical evidence, and other evidence." 20 CFR § 416.929(a). Once

a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter v. Astrue,* 504 F3d 1028, 1036 (9th Cir 2007), citing *Smolen v. Chater,* 80 F3d 1273, 1281 (9th Cir 1996).  Because the record contains no evidence of malingering by Danford, the ALJ must submit clear and convincing reasons to question his credibility.

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F3d at 1284.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.*  The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F3d at 883.

**B.    Analysis**

**1.    Workplace Motivation**

The ALJ may cite a claimant's work history in his credibility findings. *Smolen*, 80 F3d at 1284.  The ALJ may also find that a poor work history undermines a claimant's credibility. *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002).  However, "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v.*

*Chater*, 100 F3d 1462, 1465 (9th Cir 1996), quoting *Blakenship v. Bowen*, 874 F2d 1116, 1124 (6th Cir 1989).

On April 21 and June 15, 1999, social worker Hume urged Danford to consider volunteer work and to investigate sheltered workplace activity and transitional housing at an organization called Fowler House. Tr. 389-90. Hume repeated this suggestion on October 4 and November 28, 2001 (Tr. 242-43), and on May 16, 2002. Tr. 237. On August 7, 2002, Hume wrote that Danford did not make an appointment at Fowler House because he "wasn't sure he wanted to participate in the program." Tr. 235. Treating nurse practitioner McNamara additionally stated that Danford has "problems with motivation which appears [sic] to be residual, negative symptoms from his schizophrenia." Tr. 372.

These treatment notes support Danford's submission that his failure to work was due, in part, to his illness. The record also shows that Danford believed he could not perform work activity (Tr. 532-33), and that while his treatment providers urged him to consider sheltered work activity, part-time work, or volunteer work (Tr. 235, 237, 242-43, 294), none stated that he could perform a 40-hour workweek under normal, unsheltered, circumstances.

This court must defer to the ALJ's interpretation of the evidence when it is reasonably based upon the record. *Batson*, 359 F3d at 1193. Here, the ALJ ignored the encouragement by DCMH providers to Danford to pursue sheltered work, and instead found that he was unmotivated to work. The ALJ's interpretation of the record regarding statements by DCMH providers regarding Danford's ability to work does not accurately reflect the record. The ALJ's reasoning further ignores the instruction by the Ninth Circuit to refrain from chastising the judgment of a mentally ill claimant in seeking rehabilitation.

Because it not based upon the record or the proper legal standard, the ALJ's citation to Danford's allegedly poor motivation is not a clear and convincing reason to discredit him.

### 2. Activities of Daily Living

Citation to a claimant's daily activities is generally part of an ALJ's credibility analysis. *See Lingenfelter*, 504 F3d at 1028 (stating that an ALJ may find a claimant not credible if her daily activities are inconsistent with her alleged limitations). However, the ALJ may not penalize disability claimants for attempting to lead normal lives. *Cooper v. Bowen*, 815 F3d 557, 661 (9th Cir 1998).

The ALJ's generalized discussion cites nurse practitioner McNamara's August 7, 2002 statement that Danford experienced concentration difficulties, but that his daily activities were "good." Tr. 19. The ALJ did not describe what activities Danford participated in or explain the manner in which they contradicted his allegation of disability. The record also shows that McNamara offered no explanation why he characterized Danford's activities of daily living as "good," added that Danford "gets confused easily," and agreed that he could not work. Tr. 336. The ALJ's citation to McNamara's passing characterization of Danford's activities of daily living misconstrues the rest of McNamara's treatment note on that date and does not amount to a clear and convincing reason to discredit Danford.

The Commissioner also points to Danford's ability to attend church and take daily walks. The ALJ made no findings regarding Danford's church attendance, and this court may not rely upon findings the ALJ did not assert. *Bray*, 554 F3d at 1225-26, citing *SEC v. Chenery Corp.*, 332 US 194, 196 (1947). The ALJ cited Danford's walking only in conjunction with his asthma. Tr. 21. This activity is not inconsistent with Danford's allegation that he cannot work due to mental illness

and, therefore, does not discredit Danford regarding his mental health symptoms.  Furthermore, disability claimants may engage in physician-ordered exercise.  *Reddick v. Chater*, 157 F3d 715, 722 n1 (9th Cir 1998).

### C.    Conclusion

In sum, the ALJ provided few reasons for finding Danford not credible.  The ALJ's citations to Danford's allegedly poor workplace motivation and activities of daily living are not based upon the proper legal standards and do not support a finding that Danford is not credible.  Thus, the ALJ erred by finding Danford not credible.

## II.    Medical Evidence

### A.    Legal Standard

Disability opinions are reserved for the Commissioner.  20 CFR § 416.927(e)(1).  However, when making that determination, the ALJ generally must accord greater weight to the opinion of a treating physician than to the opinion of an examining physician.  *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).  The ALJ also must generally give greater weight to the opinion of an examining physician over that of a reviewing physician.  *Id.*  If two opinions conflict, an ALJ must give "specific and legitimate reasons" for discrediting a treating physician in favor of an examining physician.  *Id* at 830.  The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings."  *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005).  In addition, the ALJ must ordinarily give greater weight to opinions rendered by specialists.  20 CFR § 416.927(d)(5).

///

///

16 - OPINION AND ORDER

///

**B.**    **Analysis**

**1.**    **Treating Nurse Practitioners McNamara and Bidlack**

Danford asserts that the ALJ improperly assessed the opinions of McNamara and Bidlack, his treating nurse practitioners. Nurse practitioners are not acceptable medical sources under the Commissioner's regulations. 20 CFR § 416.913(a). However, nurse practitioners are designated as "other" medical sources, which may provide insight into the claimant's functioning and the severity of a claimant's impairments. 20 CFR § 416.913(d)(1).

**a.**    **Nurse Practitioner McNamara**

The ALJ gave "some but not great weight" to McNamara's opinions. Danford contends that this finding misconstrued McNamara's work opinions, including his suggestion that Danford investigate vocational rehabilitation or part-time work. The Commissioner responds that a physician acting as advocate is entitled to less weight.

The ALJ discounted McNamara's September 1999 statement that Danford could not work because it was issued when Danford "had recently commenced mental health treatment and had not yet stabilized, and was prior to the alleged onset date." Tr. 19. The ALJ also rejected McNamara's September 2000 and September 2001 opinions that Danford could not work 30 hours per week as unsupported by McNamara's treatment notes which showed "stability and vast improvement in functioning." *Id.* Finally, the ALJ noted that McNamara completed a letter for Danford stating that he was disabled. *Id.*

The record shows that McNamara treated Danford at approximately three-month intervals between July 1999 and May 2003 when Danford began receiving treatment with other DCMH

personnel. Tr. 195, 214, 228, 231, 234, 236, 238, 240-41, 244, 326, 336, 348, 351-52, 356-58, 360, 372, 375, 387-88. During this time period, McNamara continued to diagnose paranoid schizophrenia and prescribe medication. *Id.* The ALJ's narrative completely ignores this treatment history.

The ALJ also failed to apply the correct legal standard to his analysis of McNamara's opinions. The ALJ may not reject a medical source opinion simply because the claimant is seeking assistance in obtaining benefits. *Nguyen*, 100 F3d at 1164-65 (holding that ALJ's rejection of medical source opinion based on referral source must be based on a lack of objective medical evidence or "actual improprieties").

Further, as discussed above, the ALJ's citation to McNamara's August 7, 2002 statement that Danford's daily activities were "good" fails to account for the context of this statement.

For these reasons, the ALJ erred by rejecting nurse practitioner McNamara's opinions.

### b.    Nurse Practitioner Bidlack

The ALJ gave Bidlack's opinion "very little weight" because she "repeatedly noted that the claimant was feeling and functioning well, but fulfilled the claimant's request for a note stating that he is unable to receive employment so that he could continue to receive food stamps." Tr. 23.

The record shows that Danford visited Bidlack at DCMH every three months between February and August 2005 for medication management. Tr. 277-79. On each visit Bidlack noted Danford's ongoing schizophrenia diagnosis and continued to prescribe psychotropic medication. *Id.* On February 7, 2005, Bidlack stated that Danford reported "the meds must be working. I'm doing well," but also reported hearing voices that "do bother him a little bit." Tr. 279. On May 2, 2005, Danford reported that he "feels stable." Tr. 278. At the last visit on August 2, 2005, Bidlack

reported that Danford "asked me if I would write a note for the purposes of receiving food stamps, saying that he is unable to maintain employment due to his illness, which I did." Tr. 277.

The ALJ's analysis misconstrues Bidlack's opinion in the same manner as McNamara's opinion. The ALJ failed to account for the context of Bidlack's observations and selectively cited her notation that Danford reported "feeling well" without noting her concurrent report that Danford continued to be bothered by auditory hallucinations. The ALJ rejected Bidlack's opinion simply because she provided a note supporting Danford's allegation of disability which again contravenes the legal standard.

Therefore, the ALJ's analysis of Bidlack's opinion is not based on the record or the proper legal standards.

### 2.    Examining Psychologist Dr. Perry

Dr. Perry performed a lengthy clinical examination on Danford on March 21, 2006. Tr. 449-60. She performed a mental status examination, transcribed a detailed history from both Danford and his mother, reviewed DCMH treatment notes, and performed screening examinations for depression, anxiety, obsessive-compulsive, and personality disorders. Tr. 451-55. Dr. Perry diagnosed "schizophrenia, paranoid type," per DCMH records, "dysthymia vs. major depression," and also noted a phobia of heights and ruled out a personality disorder. Tr. 459-60. She subsequently completed a "mental residual functional capacity form" stating that Danford was "markedly" limited in his ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, travel in unfamiliar places, use public transportation, and set realistic goals or make

independent plans.  Tr. 461-62.  Dr. Perry concluded that Danford was presently functioning "as well as he ever will."  *Id.*

The ALJ discounted this opinion:

> because it was a one time examination arranged solely for the purpose of litigation.  The examiner did not have the same opportunity to observe the claimant as did the treating sources, who consistently find that the claimant is stable on medication and doing very well.  I give greater weight to the observations of treating sources at Douglas County Mental  Health.

Tr. 18.

This analysis is flawed for two reasons.  First, as previously noted, the ALJ may not reject a physician's opinion simply because a claimant procured the opinion in support of his disability benefits application.  *Nguyen*, 100 F3d at 1465.

Second, Dr. Perry based her opinion largely upon DCMH treating source reports.  Tr. 454-55.  Therefore, the ALJ's statement that he gave greater weight to DCMH treating sources than to Dr. Perry is inconsistent.  The ALJ rejected the opinions of Danford's treating nurse practitioners at DCMH and did not give significant weight to any DCMH treating source or, for that matter, any other treating source.   Because the ALJ did not assign significant weight to any DCMH treating source, she had no foundation to conclude that DCMH treating sources were entitled to greater weight than Dr. Perry's opinion.  Furthermore, DCMH treating psychiatrist Dr. Purvis, as well as McNamara and Bidlack, all assessed Danford with paranoid schizophrenia and variously noted that Danford had a cognitive impairment with impaired concentration (Tr. 195, 352), could not process complex ideas (Tr. 336), and had poor social skills (Tr. 195, 407).  Thus, the DCMH opinions are consistent with, and do not contradict, Dr. Perry's opinion.

Thus, the ALJ erred by rejecting Dr. Perry's opinion.

20 - OPINION AND ORDER

### 3.    Social Worker Hume

The ALJ cited social worker Hume's September 1999 statement that Danford "presented as wanting to be on disability and not willing to try anything else." Tr. 18-19. The ALJ also cited Hume's encouragement that Danford explore vocational rehabilitation. Tr. 19. The Commissioner asserts that Hume's records show that she believed Danford could work and only wrote letters stating that he could not work in support of his application for food stamps.

Social workers, as nurse practitioners, are construed as "other" medical sources. 20 CFR § 416.913(a). A social worker may show a claimant's ability to function and the severity of his impairment. 20 CFR § 416.913(d)(1).

The record shows that Hume met with Danford frequently throughout his treatment at DCMH between September 1999 (Tr. 378) and November 2004 (Tr. 285). Hume stated at a September 16, 1999 meeting that Danford "presented as wanting to be on disability and not willing to try anything else." Tr. 378. However, Hume made no statement that Danford could perform normal work activity throughout the period under review. Instead, Hume repeatedly urged Danford to consider plans beyond living with his elderly parents and on several occasions discussed sheltered work opportunities with him. Tr. 239, 244, 224-27, 235, 237. Hume specifically counseled Danford to consider vocational rehabilitation and sheltered work with a local organization called Fowler House. Tr. 237, 242-43, 237, 389-90.

The ALJ's inference that Hume's opinion established that Danford failed to work is not based upon the proper legal standards pertaining to mentally ill claimants. Further, the ALJ omitted reference to Hume's suggestions to Danford to pursue work in a sheltered work environment or

work part-time.  By selectively reading the record, the ALJ's analysis of Hume's opinion is not based upon the record or the proper legal standards.

///

///

### C.    __Conclusion__

The ALJ's evaluation of the medical evidence is not based upon the record.  It is also internally inconsistent regarding Dr. Perry's opinion and DCMH treating source opinions.  Thus, the ALJ erred by rejecting the opinions of McNamara, Bidlack, Dr. Perry, and Hume.

## III.    __Lay Testimony__

### A.    __Legal Standards__

The ALJ has a duty to consider lay witness testimony.  *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001).  Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition.  *Dodrill v. Shalala*, 12 F3d 915, 918-19 (9th Cir 1993).  The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting the testimony.  *Nguyen*, 100 F3d at 1467.  However, inconsistency with the medical evidence may constitute a germane reason.  *Lewis*, 236 F3d at 512.

### B.    __Analysis__

The ALJ cited the testimony of Danford's mother, Alyce Danford, that Danford had difficulty with memory, understanding, following instructions, and completing tasks.  Tr. 23.  The ALJ also noted that Ms. Danford "claimed on one portion" of her report that Danford "goes walking five times per week but cannot walk far or long due to fatigue, then indicates that the claimant can sometimes walk two miles."  Tr. 23.  The ALJ subsequently noted Ms. Danford's report to Dr. Perry

22 - OPINION AND ORDER

that Danford has difficulty making decisions and understanding instructions and has an attention span of about one hour. *Id.* Finding Ms. Danford's testimony "internally inconsistent" and unsupported by the medical record, the ALJ gave it "some but not great weight." *Id.*

The ALJ's analysis is flawed. First, the supposed contradictions in Ms. Danford's testimony are not supported by the record. Danford reported that he previously walked two to three hours per day and now walks between one half hour and one hour per day. Tr. 526. Ms. Danford's report that Danford "could not walk far," but could walk two miles, is consistent with Danford's report and reflects the decrease in his walking time. Though this court must affirm an ALJ's credibility findings regarding a claimant's activities when two equally plausible interpretations arise, *Rollins v. Massinari*, 261 F3d 853, 857 (9th Cir 2001), the ALJ's interpretation selectively reads the record. Properly considered, Ms. Danford's characterization of Danford's two-mile walks as "not far" does not establish a contradiction regarding how far Danford may walk.

Second, the ALJ stated that Ms. Danford's opinion is unsupported by the opinions of Danford's "treating evidence of record." Tr. 23. The ALJ provides no supporting citation or explanation. The ALJ may reject lay testimony that is inconsistent with the medical evidence. *Lewis*, 236 F3d at 512. However, neither the ALJ nor the Commissioner point to any medical evidence in the record contradicting Ms. Danford's testimony. The medical record does not show that Danford functioned better than Ms. Danford reported, but instead shows that he has concentration difficulties, is interrupted by auditory hallucinations, and experiences fatigue. Tr. 195, 204, 211, 241-42, 295349, 308, 388.

Thus, the ALJ erred by according only some weight to Ms. Danford's testimony.

## IV.    Step Five Findings

Danford finally asserts that the ALJ's findings that he can perform work in the national economy is not based upon substantial evidence.

At step five, the ALJ may draw upon a vocational expert's testimony to show that a claimant can perform work in the national economy. *Tackett*, 180 F3d at 1101. The ALJ's questions to the vocational expert must include all properly supported limitations. *Osenbrock v. Apfel*, 240 F3d 1157, 1165 (9th Cir 2001). Here, the ALJ propounded hypothetical questions to the vocational expert based upon an RFC assessment which did not properly consider limitations described in Danford's testimony, the medical evidence, and the lay witness testimony. Tr. 550-51. The vocational expert's testimony is therefore without probative value.

## V.    <u>Remand</u>

### A.    <u>Standard</u>

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000.), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where: "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id*, quoting *Smolen,* 80 F3d at 1292. In such circumstances the reviewing court must credit the improperly rejected evidence. *Vasquez v. Astrue*, 547 F3d 1101, 1106-07 (9th Cir 2008), *en banc review denied*, 572 F3d 586 (9th Cir 2009).

### B.    <u>Analysis</u>

The ALJ failed to properly evaluate the opinions of treating nurse practitioners Mc Namera and Bidlack and social worker Hume, as well as the testimony of Danford and his mother.  In such circumstances, the improperly rejected evidence should be credited.  *Hammock v. Bowen*, 879 F2d 498, 502 (9th Cir 1989).

In determining whether to award benefits or remand the matter for further proceedings the court must determine whether "outstanding issues remain in the record" under the second *Harman* prong.  *Harman*, 211 F3d at 1178.  Neither party asserts that the record requires development, and this court finds the record sufficient.

Therefore, the court must determine under the third *Harman* prong whether the record clearly requires an award of benefits after the improperly rejected evidence is credited.  *Id*.  Danford testified that he requires two hours of rest per day due to medication side effects and could not concentrate for periods lasting as long as 45 minutes, three or four times per day.  Tr. 527, 535.  Mrs. Danford testified that Danford is unable to finish tasks and has concentration difficulties.  Tr. 548-49.  Finally, Dr. Perry opined that Danford has a markedly limited ability to maintain attention, understand and remember detailed instructions, work in proximity to others without distraction, and set independent and realistic goals.  Tr. 461-62.  The vocational expert testified that an individual who required two hours of rest during the workday, or who was unable to concentrate due to auditory hallucinations for 45 minutes at a time, would be unable to sustain employment.  Tr. 552. Because the credited testimony establishes that Danford has these limitations, the vocational expert's testimony establishes that Danford may not perform work in the national economy at step five in the sequential proceedings.  Consequently, Danford is disabled under the Commissioner's regulations as of his December 28, 2000 alleged onset date.

///

///

## **ORDER**

The ALJ's decision is not based upon the appropriate legal standards or substantial evidence. Crediting the improperly omitted testimony establishes that Danford is disabled under Title XVI of the Act since his December 28, 2000 alleged onset date.  Therefore, the ALJ's decision is reversed and remanded for the immediate calculation and award of benefits.

Dated this 3rd day of August, 2010.

s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge